**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

JOSHUA MENDEZ

                    Plaintiff,

       v.                                           No. 12-CV-560
                                                  (TJM/CFH)

MICHAEL J. AMATO, Sheriff; MICHAEL
FRANKO, Jail Administrator;

                    Defendants.

_____

**APPEARANCES:**                     **OF COUNSEL:**

JOSHUA MENDEZ
Plaintiff Pro Se
104-18 Jamaica Avenue
Richmond Hill, New York 11418

LAW OFFICE OF THERESA PULEO      MURRY S. BROWER, ESQ.
Attorney for defendants
Post Office Box 12699
Albany, New York 12212

**CHRISTIAN F. HUMMEL**
**U.S. MAGISTRATE JUDGE**

**REPORT-RECOMMENDATION AND ORDER**[1]

    Plaintiff pro se Joshua Mendez ("Mendez"), an inmate previously in custody at a local

jail,[2] brings this action pursuant to 42 U.S.C. § 1983 alleging that defendants, the

_____

    [1]This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

    [2] Defendants indicate that "some of the time [Mendez] spent in the Montgomery County Correctional Facility was based upon a conviction and some was pending his trial." Franko Aff. (Dkt. No. 23-1 at 1-7) ¶ 2. It appears that shortly after Mendez was arrested, but prior to the relevant time in question, his parole was revoked thus making him an incarcerated prisoner for purposes of this Report-Recommendation. See infra at 2-3. While new charges were lodged against him during this time, this does not change the fact that as of December 6, 2011, when Mendez's parole was revoked at his revocation hearing, he was an incarcerated inmate and not a pretrial detainee.

Montgomery County Sheriff and Jail Administrator, violated his constitutional rights under the Eighth Amendment.  Compl. (Dkt. No. 1).  Presently pending is defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56.  Dkt. No. 23.  Mendez has not responded to the present motion.  For the following reasons, it is recommended that defendants' motion be granted in part and denied in part.[3]

## I.  Failure to Respond

Mendez did not oppose defendants' motion.  "[J]udgment should not be entered by default against a pro se plaintiff who has not been given any notice that failure to respond will be deemed a default."  Champion v. Artuz, 76 F.3d 483, 486 (2d Cir. 1996).  Defendants' provided such notice in the notice of motion, stating that Mendez "must respond by affidavits or as otherwise provided in the rule, setting forth specific facts showing that there is a genuine issue of material fact for trial."  Dkt. No. 23 at 1.  Moreover, the Court provided notification to Mendez regarding both the date of his response and the consequences of failing to respond.  Dkt. No. 24.  Mendez also requested, and was granted, three extensions of time to file a response to the pending motion.  Dkt. Nos. 28, 29, 31, 32; Dkt. entries dated February 8, 2013 and March 1, 2013.  Despite such notice and extensions, Mendez failed to respond.  Because Mendez has not responded to raise any question of material fact, to

---

[3] Defendants move for summary judgment contending that (1) Mendez's conditions of confinement and Equal Protection claims were meritless, (2) Mendez has failed to allege a physical injury sufficient to grant him the damages he seeks, and (3) they are protected by qualified immunity.  Defs Am. Mem. of Law (Dkt. No. 26) at 5-14.  Defendants state, in a conclusory manner, that Mendez's access to counsel, religious services, and vocational training claims are also meritless.  Id. at 5.  Defendants fail to discuss the merit of Mendez's inartfully pled due process claims which, for the reasons stated infra, should not be dismissed.

the extent defendants have pled properly supported facts, such facts as set forth by defendants are accepted as true. See Cusamano v. Sobek, 604 F. Supp. 2d 416, 452-453, 453 n.48 (N.D.N.Y. 2009); see also N.D.N.Y.L.R. 7.1(a)(3) ("The Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert.") (emphasis in original).

## II. Background

### A. Involuntary Protective Custody ("IPC")

Revised in January 2010, Montgomery County Correctional Facility ("Montgomery") had a specific policy regarding administrative segregation for protective custody. Dkt. No. 23-2 at 120, 123. After an inmate had undergone screening and classification, he could be assigned to protective custody, being locked in his cell for twenty-three hours a day for a sixty day period of time. Id. at 123. However, the inmate could seek review of said classification, through a written request to the jail administrator, after sixty days provided "there [wa]s no further threat to [the inmate's] safety . . . ." Id. If such a threat remained, the inmate's situation may be re-evaluated every thirty days until such time as the threat dissipated. Id.

Mendez arrived at Montgomery on November 3, 2011, after being arrested for resisting arrest. Franko Aff. (Dkt. No. 23-1 at 1-7) ¶ 2; Dkt. No. 23-2 at 107 (Securing Order charging Mendez with Resisting Arrest and remanding him to Montgomery until bail is posted). Upon arrival, Mendez was placed into the general population. Compl. at 4. Upon arrival, all inmates are processed and evaluated` for placement in the appropriate housing unit

3

consistent with the policy outlined above. Franko Aff. ¶ 3; Id. ¶ 6 (explaining that classification officers consider an inmate's "past criminal history . . . and information if that person has been in the jail on other occasions," as well as interviewing the inmate). Mendez's initial classification awarded him (1) thirty points for his current charges; (2) fifteen points for his prior non-violent felony or sex offense misdemeanor charges; (3) eight points for substance abuse; (4) ten points for his mental health history; (5) twenty points for institutional misconduct; and (6) five points for an assault history. Dkt. No. 23-1 at 113, Dkt. No. 23-1 at 1-2. Despite the fact that Mendez's score qualified him for close custody supervision, an override was used to place Mendez in the general population. Dkt. No. 23-2 at 2-3; Franko Aff. ¶ 3. Sometime between the date of his arrest and December 6, 2011, a violation of parole was filed and on December 6, 2011, Mendez's parole was revoked during a final revocation hearing. Dkt. No. 23-2 at 14; see also Dkt. No. 23-2 at 11, 13 (subsequent parole revocation certificates of disposition indicating that Mendez's parole was revoked during a hearing on December 6, 2011). Accordingly, after December 6, 2011, Mendez was in custody.

New charges were filed against Mendez on or about January 20, 2012. Compl. at 4; Franko Aff. ¶ 3. Presumably, these charges were the basis of the indictment charging Rape and Criminal Sexual Acts both in the Third Degree filed on April 19, 2012. Dkt. No. 23-2 at 90-91. Mendez was reclassified at this point. Dkt. No. 23-1 at 104-108. Mendez's classification was determined after evaluating "the [sex based] charges pending and his past history of criminal offenses . . . [for which defendants concluded that Mendez] was therefore considered to be vulnerable to injury from inmates housed in the regular population." Franko Aff. ¶ 5; see also Dkt. No. 23-1 at 104-108 (inmate classification form

4

awarding (1) ten points for requesting or requiring administrative segregation for safety; (2) thirty-two points for a pending violent felony or sex offense; (3) fifteen points for a prior violent felony or sex offense; (4) eight points for substance abuse usage; (5) ten points for mental health concerns; (6) twenty points for institutional misconduct; and (7) five points for a history of assault; and determining that Mendez required protective custody and close supervision despite a lack of any victimization history "due to [his] current charges.").

Mendez was immediately transferred to IPC on January 20, 2012 because Mendez's "impending charges [were] being broadcast over the news channels," and classification paperwork was completed within four days thereafter. Dkt. No. 23-1 at 109 (Administrative Segregation Form citing televised charges as basis for IPC to protect Mendez's "own personal safety, [as well as] . . . the safety, security and general good order of [Montgomery] . . . ."); Dkt. No. 23-1 at 104-108 (inmate classification forms dated January 24, 2012); see also Franko Aff. ¶ 3 ("In January on the 20th [Mendez] was reevaluated based upon new charges that were filed against him. His classifi[cation] as protective custody-involuntary for his own protection . . . ."). Mendez signed the Administrative Segregation Notice Form indicating that he was being placed in IPC for his own protection. Dkt. No. 23-1 at 109.

"In the late fall of 2010 and continuing into the winter and spring of 2011[] the inmate population of Montgomery . . . was growing[; thus] the Sheriff and [Administrator] began to discuss how the rising population might impact the safety of inmates and . . . of corrections officers assigned to the various pods . . . . " Franko Aff. ¶ 8. Specifically during this time period, there was "a rise in the population of sex offenders[, which] . . . was a concern given that sex offenders are often victimized in a correction setting when housed in the general

population." Franko Aff. ¶ 9. This also caused a concern for the safety of the correctional staff "who intervene to break up fights and provide a higher level of protection to the vulnerable population." Id.

While in IPC, it is undisputed that Mendez was locked in his cell for twenty-three hours a day, with one hour of recreation during which he could use the phone or shower. Compl. at 4-5; see also Franko Aff. ¶ 10 (confirming that the sex offenders were locked down for twenty three hours a day because "[w]hile [defendants] would have liked to have given each of the persons housed at the jail the ability to move about the pod, this was not possible because of the number of persons the facility was housing and . . . the then current staffing levels."); Id. ¶ 11 (explaining that IPC inmates "were not given the option to join the general population [yet w]hile in [IPC, inmates] . . . were allowed out of their cells for one hour each day for recreation, showers, etc."). During the time period in question, while he was in IPC, Mendez was upset that his confinement was restricted similarly to those who had committed severe disciplinary infractions who then were subjected to restricted access about the housing unit, restricted ability to shower and access various amenities, limited access to the law library and religious services, and limited opportunities to communicate freely with their attorney, family and other inmates, and watch television. Compl. at 4-5.

Defendants emphatically state that placement in IPC was not punitive, but prophylactic. Franko Aff. ¶ 14 (explaining IPC placements were "intended primarily to address the conditions at the jail of a higher than normal population of sex offenders who belong to a class of inmates who are most often targeted for victimization."). Further, defendants assert that IPC inmates "were allowed visitation from those outside the jail during a time set aside for [IPC] . . . inmates." Franko Aff. ¶ 12; see also Dkt. No. 23-2 at 130 (facility rule book

6

with visitation schedule indicating IPC inmates had visitation between 10:00 and 11:00 a.m. on Monday and Wednesday). Defendants also contend that IPC inmates could participate in educational activities, just not with those inmates in general population, shower during recreation, have access to the law library, practice religious activities, and participate in visits with their attorneys. Franko Aff. ¶¶ 12, 13, 18; see also Dkt. No. 23-2 at 129 (facility rule book outlining attorney visitation).

Between March 10 and 15, 2012, Mendez submitted three grievances regarding his continued placement in IPC. Dkt. No. 23 at 59, 61, 70, 72, 73, 75. The grievances were all denied as unwarranted (Dkt. No. 23 at 60, 71, 74) to which Mendez filed an appeal (Dkt. No. 23 at 62). Defendants incorrectly contend that Mendez's "records do reflect that he attempted to file grievances over a variety of matters but not with regard to his status in protective custody." Franko Aff. ¶ 15.

On March 13, 2012 the New York State Commission of Correction ("COC") authored a letter to defendant Franko stating that:

> inmates who are in Protective Custody (PC) and are not confined due to disciplinary reasons, or bona fide safety and security reasons (administrative segregation order with written documentation), should not be locked in for extended periods of time. Inmates in PC should have the same rights and privileges as the general population.

Dkt. No. 23 at 55[4]; see also Compl. at 5 (outlining contents of above letter); Franko Aff. ¶ 20 ("In March of 2012 it was suggested to [Franko] in person, and by mail by a representative of the . . . [COC], that the 23-hour a day lock up was not appropriate unless there was an

---

[4] While this response was not in regards to Mendez, but another inmate, it is still relevant to determining the present motion.

identified safety and security risk."). On March 16, 2012, Mendez authored another letter to

the COC stating that while Franko reclassified IPC inmates who had sex offense

convictions in their criminal histories, those with pending sex crimes, such as Mendez,

remained in IPC and were not reclassified. Dkt. No. 23 at 47-49. Mendez authored a

second letter to the COC on March 19, 2012, which he also provided to Franko. Dkt. No.

23 at 50-52. Franko responded on March 21, 2012 by saying "thank you for sharing the

letter . . . ." Dkt. No. 23 at 50. Mendez authored a final letter to the COC on March 21,

2012, voicing similar complaints regarding his continued IPC confinement. Dkt. No. 53-54.

On February 21, 2012, Mendez was given a misbehavior report citing multiple infractions

including contraband, theft of property, and smuggling. Dkt. No. 23-1 at 84, 87. On March

9, 2012, Mendez had a disciplinary hearing for the misbehavior report where he was

adjudged guilty of two infractions. Dkt. No. 23-1 at 83, 85-86. On March 22, 2012,

Mendez's classification was reevaluated. Dkt. No. 23-1 at 97-100. Mendez was awarded

(1) ten points for requested or required administrative segregation; (2) thirty-seven points for

the severity of his current charges included a parol warrant and non-violent felony, sex

offense or federal charge; (3) fifteen points for the severity of his criminal history; (4) eight

points for substance abuse; (5) ten points for a mental health history; (6) twenty points for a

history of institutional misconduct; and (7) fourteen points for the severity of the pending

warrant. Dkt. No. 23-1 at 97-98. Mendez remained in IPC "for his own personal safety."

Dkt. No. 23-1 at 99; see also Franko Aff. ¶ 20 (explaining that defendants "believed that

there were such [safety and security] risks identified by the classification process . . . [and]

was therefore kept in protective custody.")

Defendants assert that during the meeting with the COC, Franko "was informed that

[Montgomery's] classification scheme was not incorrect [and] . . . th[e] evaluation forms being used did not discriminate . . . It was merely suggested that . . . Montgomery . . . review its procedures to insure that those in protective custody needed to be there." Franko Aff. ¶ 21. It appears that Mendez was eventually released from IPC sometime in September 2012. Dkt. No. 23-1 at 34-50. For the time relevant to this complaint, Mendez was continually confined in IPC for two months, from the end of January through the end of March.

## B. Conditions of Confinement Requests & Grievances

### 1. Law Library and Legal Calls

On January 31, 2012, Mendez authored a grievance, which was also sent to Judge Aison, requesting to use the inmate facility phone to contact his legal counsel as he was denied as much earlier that day. Dkt. No. 23-1 at 64, 66. Franko responded to both Mendez and Judge Aison on February 2, 2012, indicating that Mendez had been allowed to make his legal call and his staff had been instructed to approve Mendez's reasonable requests to call his attorney. Dkt. No. 23-1 at 63, 65, 69. Mendez responded, thanking Franko for allowing him to make his legal calls and then making a subsequent request to use the phones within the inmate pods as opposed to in the booking room. Dkt. No. 23-1 at 70.

On March 15, 2012, Mendez also filed a grievance stating that on March 11 he had requested a law library pass; however, no law library trip was made. Dkt. No. 23 at 81. Further, on March 13 other IPC inmates were allowed to go to the law library but Mendez

was not and on March 14 other general population inmates were allowed to attend the law library call-out and Mendez was not.  Id.  Mendez sought adequate, daily access to the library.  Id.  The grievance was denied stating that "all inmates [are] given dailey [sic] and equal access [to the library] Monday through Friday."  Dkt. No. 23 at 82; see also Dkt. No. 23-2 at 56-57 (granting Mendez's requests for law library passes from March 11 and 15 on March 15 and 20 respectfully).  Mendez appealed these findings on March 23, 2012.  Dkt. No. 23 at 83.

Mendez sought a request to have his legal documents signed by a notary, as well as receiving copies of his inmate account, to successfully complete the present complaint's in forma pauperis application.  Dkt. No. 23-1 at 52.  The request was granted and the application was successfully filed.  Dkt. No. 23-1 at 52-55; see also Dkt. Nos. 2-3, 5.

Mendez filed nine requests to use the law library between January 29, 2012 and March 20, 2012.  Dkt. No. 23-2 at 55-63.  All requests were approved.  Id.  Specifically, four approvals indicated the exact times which Mendez utilized the law library.  Dkt. No. 23-2 at 63 (attended law library on February 2, 2012 from 20:50-22:00); Dkt. No. 23-2 at 62 (attended law library on February 4, 2012 from 18:15-19:15); Dkt. No. 23-2 at 59 (attended law library on February 29, 2012 from 18:10 to 20:15); Dkt. No. 23-2 at 55 (attended law library on March 27, 2012 from 20:00 to 21:15).

### 2. Educational Requests

On January 22, 2012, Mendez authored a letter requesting to take the General Education Development ("GED") test.  Dkt. No. 23-1 at 60-61.  On January 25, 2012 a notation by defendant Franko indicates that they were "awaiting [a] school plan," for

Mendez.  Dkt. No. 23-1 at 60.

## C. Damages

Mendez contends that his continued IPC "has left a scar on the well being of [his] mental health," resulting in subsequent mental health treatment and medication.  Compl. at 4, 7. Consequently, Mendez seeks "$750,000 for unlawful discriminatory treatment and knowingly unlawfully confind [sic] [Mendez] to a cell for 23 hours a day from Jan. 21, til March 27.  For the mental pain and suffering [he] underwent during that time.  For the denile [sic] of right and privileges . . . [a]nd for the emotional stress and depression that has lef a scar on [his] well being . . . ."  Compl. at 8.

## III.  Discussion

In his complaint, Mendez alleges that his constitutional rights were violated by defendants' discriminatory practice of housing inmates with a present or prior sex offenses in IPC.  While not stated in constitutional terms, such contentions are best analyzed pursuant to an Equal Protection analysis.  Furthermore, liberally construing Mendez's complaint, he has alleged a violation of his Fourteenth Amendment regarding due process procedures for both his initial and continued IPC confinement, as well as his Eighth Amendment rights regarding the conditions of confinement.  Lastly, liberally construing Mendez's allegations, he also proffered claims regarding his access to counsel, the law library, and religious services.  Defendants seek dismissal contending that (1) Mendez's conditions of confinement, access to counsel and law library, access to religious services,

and Equal Protection claims are meritless; (2) they are entitled to qualified immunity; and (3) the Prisoner Litigation Reform Act ("PLRA") precludes any recovery given the lack of physical injuries.

## A.  Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to any material fact if supported by affidavits or other suitable evidence and the moving party is entitled to judgment as a matter of law.  The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion.  FED. R. CIV. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Facts are material if they may affect the outcome of the case as determined by substantive law.  Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).  All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party.  Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).

The party opposing the motion must set forth facts showing that there is a genuine issue for trial.  The non-moving party must do more than merely show that there is some doubt or speculation as to the true nature of the facts.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment.  Gallo v. Prudential Residential Servs. 22 F.3d 1219, 1223–24 (2d Cir. 1994); Graham v. Lewinski, 848 F.2d 342, 344 (2d Cir. 1988).

When, as here, a party seeks judgment against a pro se litigant, a court must afford the

12

non-movant special solicitude.  See Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006).  As the Second Circuit has stated,

> [t]here are many cases in which we have said that a pro se litigant is entitled to "special solicitude," . . . that a pro se litigant's submissions must be construed "liberally,". . . and that such submissions must be read to raise the strongest arguments that they "suggest," . . . .  At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not "consistent" with the pro se litigant's allegations, . . . or arguments that the submissions themselves do not "suggest," . . . that we should not "excuse frivolous or vexatious filings by pro se litigants," . . . and that pro se status "does not exempt a party from compliance with relevant rules of procedural and substantive law . . . ."

Id. (citations and footnote omitted); see also Sealed Plaintiff v. Sealed Defendant #1, 537 F.3d 185, 191–92 (2d Cir. 2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds pro se, . . . a court is obliged to construe his pleadings liberally.'" (citations omitted)).  However, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion; the requirement is that there be no genuine issue of material fact.  Anderson, 477 U.S. at 247–48.


### B. First Amendment

### 1. Law Library

The Supreme Court has held "that the fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries . . . ."  Bounds v. Smith, 430 U.S. 817, 828 (1977); see also Lewis v. Casey, 518 U.S. 343, 351 (1996).  This

right is not unlimited and "an inmate cannot establish relevant actual injury simply by establishing that his prison's law library or legal assistance program was subpar in some theoretical sense." Lewis, 518 U.S. at 351. Thus, in order to demonstrate an actionable injury, "a plaintiff must assert non-conclusory allegations demonstrating both (1) that the defendant acted deliberately and maliciously, and (2) that the plaintiff suffered an actual injury." Vega v. Artus, 610 F. Supp. 2d 185, 201 (N.D.N.Y. 2009) (citations omitted); see also Lewis, 518 U.S. at 351-52 (explaining the actual injury requirement).

In this case, Mendez has failed to allege a First Amendment violation. First, despite Mendez's allegations that he was refused access to the law library and the grievances that he filed, his inmate record reveals that his grievance was timely and appropriately remedied and that of the nine requests submitted, all were approved, and five included notations for the specific times during which Mendez was in the library. Such proof vitiates Mendez's claims that defendants deliberately or indifferently precluded him from accessing the law library when needed.

Further, Mendez has failed to state any type of actual injury which occurred as a result of the apparent discrepancy in access to the law library experienced by those in IPC. Mendez has failed to identify which legal claims were frustrated, if they were meritorious, and how that research would have supported the viability of such claims. In the absence of any evidence that Mendez suffered any actual injury precluding him from pursuing any judicial action, defendants' motion as to any claimed deficiency in Mendez' access to Montgomery's law library should be granted. See Christopher v. Harbury, 536 U.S. 403, 415 (2002) ("[T]he underlying cause of action . . . is an element that must be described in the complaint, just as much as allegations must describe the official acts frustrating the

litigation.").


## 2. Religious Services

The First Amendment protects the right to free exercise of religion.  <u>See generally</u> <u>Cutter</u>

<u>v. Wilkinson</u>, 544 U.S. 709, 719 (2005).  "Prisoners have long been understood to retain

some measure of the constitutional protection afforded by the First Amendment's Free

Exercise Clause."  <u>Ford v. McGinnis</u>, 352 F.3d 582, 588 (2d Cir. 2003) (<u>citing</u> <u>Pell v.</u>

<u>Procunier</u>, 417 U.S. 817, 822 (1974)).

> To assess a free exercise claim, a court must determine (1)
> whether the practice asserted is religious in the person's scheme of
> beliefs, and whether the belief is sincerely held; (2) whether the
> challenged practice of the prison officials infringes upon the
> religious belief; and (3) whether the challenged practice of the
> prison officials furthers some legitimate penological objective.

<u>Farid v. Smith</u>, 850 F.2d 917, 926 (2d Cir. 1988) (citations omitted).  This right is not

absolute and can be limited due to the inmate's "incarceration and from valid penological

objectives – including deterrence of crime, rehabilitation of prisoners, and institutional

security."  <u>O'Lone v. Estate of Shabazz</u>, 482 U.S. 342, 348 (1987) (citations omitted);

<u>see</u> <u>also</u> <u>Benjamin v. Coughlin</u>, 905 F.2d 571, 574 (2d Cir. 1990) ("The governing standard

is one of reasonableness, taking into account whether the particular regulation . . . is

reasonably related to legitimate penological interests.") (citations omitted).

> The <u>Turner</u> Court determined that the four factors to be considered
> are: 1) whether there is a rational relationship between the
> regulation and the legitimate government interests asserted; 2)
> whether the inmates have alternative means to exercise the right;
> 3) the impact that accommodation of the right will have on the
> prison system; and 4) whether ready alternatives exist which
> accommodate the right and satisfy the governmental interest.

Benjamin, 905 F.2d at 574 (citing <u>Turner v. Safely</u>, 483 U.S. 78, 89-91 (1987).

""[P]risoners have a constitutional right to participate in congregate religious services." <u>Salahuddin v. Coughlin</u>, 993 F.2d 306, 308 (2d Cir. 1993) (citations omitted). "Confinement in keeplock does not deprive prisoners of this right." <u>Id.</u> (citations omitted). While the Second Circuit has accorded prison officials great deference in the administration and "responsibility of maintaining order in prisons, . . . prisoners should be afforded every reasonable opportunity to attend religious services, whenever possible." <u>Young v. Coughlin</u>, 866 F.2d 567, 570 (2d Cir. 1989) (citations omitted). "The governing standard is one of reasonableness, taking into account whether the particular regulation affecting some constitutional right asserted by a prisoner is reasonably related to legitimate penological interests." <u>Benjamin v. Coughlin</u>, 905 F.2d 571, 574 (2d Cir. 1990) (citations omitted). The same analysis is undertaken when there is an allegation that "an individual dec[ided] to deny a prisoner the ability to engage in some requested religious practice." <u>Ford</u>, 352 F.3d at 595 n.15 (citations omitted).

In this case, Mendez has failed to state a First Amendment claim. Mendez' complaint fails to establish the first element in the analysis as Mendez' complaint and motion papers remain silent with respect to what religion Mendez was a member of and, by extension, what sincerely held religious practices were withheld from him during his IPC confinement. Mendez' general and conclusory claims that all IPC inmates were precluded from practicing religion are insufficient to raise a question of material fact. Without establishing a firmly held religious belief or identifying any interference with those practices, the discussion cannot further progress to an evaluation of whether isolating IPC residents from general population religious services was reasonable. <u>See</u> <u>e.g.</u>, <u>Salahuddin v. Goord</u>, 467 F.3d

263, 274-75 (2d Cir. 2006) (articulating test that inmates "must show at the threshold that the disputed conduct . . . burdens his sincerely held religious beliefs," prior to advancing to the <u>Turner</u> test and "legitimate penological interests that justify the impinging conduct . . . .") (citations omitted).  Accordingly, defendants' motion on this ground should be granted.

### C. Access to Counsel

"[T]he right to counsel and the right to access to the court are interrelated . . . [h]owever, the two rights are not the same."  <u>Benjamin v. Fraser</u>, 264 F.3d 175, 186 (2d Cir. 2001). "[A]ccess claims . . . concern[] the ability of . . . prisoners to attack their sentences, directly or collaterally, and to challenge the conditions of their confinement.  By contrast . . . the Sixth Amendment [confers the] right of a pretrial detainee, in a case brought against him by the state, to utilize counsel in his defense."  <u>Id.</u> (internal quotation marks, alterations, and citations omitted).

### 1. Sixth Amendment

"[P]retrial detainees need access to the courts and counsel . . . to defend against the charges brought against them."  <u>Benjamin v. Fraser</u>, 264 F.3d 175, 186 (2d Cir. 2001) (citations omitted).  Accordingly, the Second Circuit has determined that a pretrial detainee's Sixth Amendment rights are infringed upon when prison regulations "unjustifiably obstruct", "infringe", "unreasonably burden", or "significantly interfered" with the detainee's access to counsel.  <u>Id.</u> at 187 (quoting <u>Procunier v. Martinez</u>, 416 U.S. 396, 419 (1989); <u>Bell v. Wolfish</u>, 441 U.S. 520, 547 (1979); <u>Wolfish v. Levi</u>, 573 F.2d 118, 133 (2d Cir. 1978);

Cobb v. Aytch, 643 F.3d 946, 957 (3rd Cir. 1981) respectively).

In this case, Mendez states that the twenty-three hours a day he spent in lock down results in him "not rec[eiving] the fair treatment of communication with . . . lawyers." Compl. at 5. However, in defendants' papers the facility rule book indicates that accommodations can be made, upon request, for attorneys visits for those individuals in IPC. The undersigned liberally construed Mendez's complaint as Mendez's conclusory allegations fail to indicate what counsel he was denied access to and for what purpose the counsel was involved, when his requests were made and how they were handled, or how the defendants' proffered policy obstructed, interfered, unreasonably burdened or infringed upon his Sixth Amendment rights. Conversely, the record indicates that when Mendez grieved his denied request to call his attorney, Franko immediately remedied the situation allowing Mendez to call and prompting Mendez to author a letter to Franko, thanking Franko for his involvement. It is assumed that Mendez refers to his representation regarding his pending criminal matter for sexual offenses lodged in January of 2012 and that he is contending that his ability to communicate with that counsel in pursuing his criminal defense was impeded. However, for the reasons stated above, upon the present record such conclusory claims are insufficient to establish a Sixth Amendment violation and defendants' motion should be granted on this ground.

### 2. First Amendment and Due Process

Pretrial detainees also have a constitutional right for meaningful access to the courts, which may be satisfied pursuant to the appointment of counsel. Bourden v. Loughren, 386 F.3d 88, 93 (2d Cir. 2004) (citing cases). Such a right "requires that prisoners defending

18

against criminal charges or convictions (either directly or collaterally) or challenging the conditions of their confinement . . . not be impeded from presenting those defenses and claims for formal adjudication by a court." Id. at 96 (citing inter alia Bounds v. Smith, 430 U.S. 817, 823 (1977)).  Thus,

> when a prisoner with appointed counsel claims that he was hindered by prison officials in his efforts to defend himself or pursue other relevant legal claims, he must show that, on the facts of his case, the provision of counsel did not furnish him with the capability of bringing his challenges before the courts, not that he was denied effective representation in the court.

Id. at 98 (citations omitted).

Construing Mendez's claims liberally, there is also the potential that he is contending that defendants denied him meaningful access to the courts.  Mendez attempts to allege that defendants restricted Mendez's access to the point where it was an impediment.  However, for substantially the same reasons as stated above, Mendez's complaint fails to indicate what he was hindered from completing.  Mendez does not make any contentions about his ability to present his defense or how his criminal action proceeded, or failed to proceed, while incarcerated at Montgomery.  Nor does Mendez contend that his counsel was incapable of presenting his various defense arguments.  Thus, even viewing the facts in the light most favorable to Mendez, he has failed to proffer facts sufficient to support any potential access to the court claim.  Accordingly, defendants' motion on this ground is granted.

### D. Eighth Amendment

The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual

punishment." U.S. Const. amend. VIII. "The Constitution does not mandate comfortable prisons but neither does it permit inhumane ones, and it is now settled that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." Farmer v. Brennan, 511 U.S. 825, 832 (1884). As with other Eighth Amendment claims, a "plaintiff must satisfy both an objective . . . and subjective test." Jolly v. Coughlin, 76 F.3d 468,  480 (2d Cir. 1996) (citations omitted). Thus, "a prisoner may prevail only where he proves both an objective element – that the prison officials' transgression was sufficiently serious– and a subjective element – that the officials acted, or omitted to act, with a sufficiently culpable state of mind . . . ." Phelps v. Kapnolas, 308 F.3d 180, 185 (2d Cir. 2002) (internal quotation marks and citations omitted).

The objective prong can be satisfied by

> conditions of confinement . . . [which] in combination [constitute an Eighth Amendment violation] when each would not do so alone . . . [such as] when the conditions have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise – for example, a low cell temperature at night combined with a failure to issue blankets.

Davidson v. Murray, 371 F. Supp. 2d 361, 370 (W.D.N.Y. 2005) (citations omitted). However, "[n]othing so amorphous as overall conditions can rise to the level of cruel and unusual punishment when no specific deprivation of a single human need exists." Id. (citing Wilson v. Seiter, 501 U.S. 294, 304-05 (1991)).  The subjective prong requires "a prison official [to] have a sufficiently culpable state of mind . . ., of deliberate indifference to inmate health or safety" Farmer, 511 U.S. at 834 (citations omitted).

In this case, Mendez' claims that he was confined in administrative segregation for twenty-three hours a day, only allowed to shower, visit his family, use the phone, and

interact with other inmates during his one hour long recreation, prohibited from wandering around outside of his cell, limited in his ability to watch television, and being forced to pick and choose which amenities he wanted to avail himself to given his limited amount of time outside of his cell, are insufficient to support an Eighth Amendment claim. Generally, administrative segregation conditions, even though "restrictive and . . . harsh, [are insufficient to establish Eighth Amendment violations because] they are part of the penalty that criminal offenders pay for their offenses against society." Rhodes v. Chapman, 452 U.S. 337, 347 (1981). Mendez has failed to allege any deprivations of a single, identifiable human need. See Greene v. Furman, 610 F. Supp. 2d 234, 237 (W.D.N.Y. 2009) (holding that inmate's Eighth Amendment claim originating from his confinement in segregation was insufficient to state a constitutional claim as the allegations of denied exercise, showers and haircuts, did not represent atypical treatment, result in physical injury, or establish cruel and unusual punishment). Moreover, to the extent Mendez contends that his inability to program was an Eighth Amendment violation, such contentions are meritless. See Griffin v. Coughlin, 743 F. Supp. 1006, 1017 (N.D.N.Y. 1990) ("[Inmates] have no eighth amendment right to prison work and educational activities.") (citations omitted). Mendez was given warmth, shelter, clothing, food, and exercise. Mendez was allowed to shower and have morning visitations throughout the week. Mendez was just upset that he did not have more freedom with his time and movement. However, such claims are insufficient to establish the objective prong of the analysis.

Accordingly, to the extent such Eighth Amendment claims are apparent, they should be dismissed.

## E. Fourteenth Amendment

## 1. Due Process[5]

The Due Process Clause of the Fourteenth Amendment states that "[n]o State shall . . . deprive any person of life, liberty, or property without due process of law." U.S. Const. Amend. XIV § 1. It is important to emphasize that due process "does not protect against all deprivations of liberty. It protects only against deprivations of liberty accomplished without due process of the law." Baker v. McCollan, 443 U.S. 137, 145 (1979) (internal quotation and citations omitted). "A liberty interest may arise from the Constitution itself, . . . or it may arise from an expectation or interest created by state laws or policies." Wilkinson v. Austin, 545 U.S. 209, 221 (2005) (citations omitted). An inmate retains a protected liberty interest to remain free from segregated confinement if the prisoner can satisfy the standard set forth in Sandin v. Conner, 515 U.S. 472, 483-84 (1995).

## a. Procedural Due Process

To state a claim for procedural due process, there must first be a liberty interest which requires protection. See generally Valmonte v. Bane, 18 F.3d 992, 998 (2d Cir. 1994) ("[P]rocedural due process questions [are analyzed] in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient.") (citing Kentucky Dep't of Corr. v. Thompson, 490 U.S. 454, 460 (1989)). The Second Circuit has articulated a two-part test whereby the length of time a

---

[5] Defendants' memorandum of law did not address any due process issues.

prisoner was placed in segregation as well as "the conditions of the prisoner's segregated confinement relative to the conditions of the general prison population" are to be considered. Vasquez v. Coughlin, 2 F. Supp. 2d 255, 259 (N.D.N.Y. 1998). This standard requires a prisoner to establish that the confinement or condition was atypical and significant in relation to ordinary prison life. See Jenkins v. Haubert, 179 F.3d 19, 28 (2d Cir.1999); Frazier v. Coughlin, 81 F.3d 313, 317 (2d Cir.1996). This analysis is applicable to confinement for either punitive or administrative reasons. Arce v. Walker, 139 F.3d 329, 334-35 (2d Cir. 1998).

While not a dispositive factor, the duration of a disciplinary confinement is a significant factor in determining atypicality. Colon v. Howard, 215 F.3d 227, 231 (2d Cir. 2000) (citations omitted). The Second Circuit has not established "a bright line rule that a certain period of SHU confinement automatically fails to implicate due process rights." Palmer v. Richards, 364 F.3d 60, 64 (2d Cir. 2004) (citations omitted). Instead, the Second Circuit has provided guidelines that "[w]here the plaintiff was confined for an intermediate duration—between 101 and 305 days—development of a detailed record of the conditions of confinement relative to ordinary prison conditions is required." Id. at 64–65 (citing Colon, 215 F.3d at 232). In the absence of a dispute about the conditions of confinement, summary judgment may be issued "as a matter of law." Id. at 65 (citations omitted). Conversely, where an inmate is confined under normal SHU conditions for a duration in excess of an intermediate disposition, the length of the confinement itself is sufficient to establish atypicality. Id. (citing Colon, 215 F.3d at 231–32). Also, "[i]n the absence of a detailed factual record, cases in this Circuit typically affirm dismissal of due process claims where the period of time spent in SHU was short – e.g. 30 days – and there was no

23

indication [of] . . . unusual conditions."  <u>Harvey v. Harder</u>, No. 09-CV-154 (TJM/ATB), 2012 WL 4093791, at *6 (N.D.N.Y. July 31, 2012) (citing <u>inter</u> <u>alia</u> <u>Palmer</u>, 364 F.3d at 65-66).[6]

### i. Initial Placement in IPC

New York regulations require "chief administrative officer[s] of each [local or county] correction facility [to] establish, implement, and maintain a formal and objective system for the consistent classification of all inmates."  N.Y. COMP. CODES R. & REGS. TIT. 9, § 7013.1. These detailed regulations provide (1) various classification categories (<u>Id.</u> § 7013.4); (2) provisions for a screening instrument which records information regarding the inmate's physical and mental health, criminal history, incarceration history, and any other relevant information (<u>Id.</u> § 7013.7); (3) requirements that classification be generally determined within five business days of admission into the facility (<u>Id.</u> § 7013.8); and (4) conditions under which an inmate's classification should be changed (<u>Id.</u> § 7013.9).

The Montgomery policies regarding classification reference the above regulations.  Dkt. Dkt. No. 23-2 at 132.  Specifically, the Montgomery policy states that initial screening and risk assessment will occur and classification will generally happen within five business days. <u>Id.</u>  (citing N.Y. COMP. CODES R. & REGS. TIT. 9, § 7013).  Additionally, the policy provides that

> INMATES WHO . . . HAVE BEEN ASSIGNED TO PROTECTIVE CUSTODY SEGREGATION AFTER THE COMPLETION OR DURING THEIR CLASSIFICATION SCREENING WILL BE SUBJECT TO A <u>23 HOUR A DAY LOCK IN STATUS</u> AND WILL BE HOUSED SEPARATELY FROM GENERAL POPULATION, FOR A MANDATORY <u>60 DAY PERIOD OF TIME.</u>  AFTER 60

---

[6] All unreported decisions are attached as exhibits to this Report-Recommendation.

> DAYS YOU MAY REQUEST, IN WRITING, TO THE JAIL
> ADMINISTRATIVE OFFICER A CHANGE IN YOUR PROTECTIVE
> CUSTODY STATUS.  IF IT IS DETERMINED THAT THERE IS NO
> FURTHER THREAT TO YOUR SAFETY, YOU WILL BE TAKEN
> OUT OF PROTECTIVE CUSTODY AND MOVED INTO GENERAL
> POPULATION.  HOWEVER, IF IT IS DETERMINED THAT A
> THREAT TO YOUR SAFETY STILL EXISTS, YOU WILL BE KEPT
> IN PROTECTIVE CUSTODY AND YOUR SITUATION WILL BE
> RE-EVALUATED EVERY 30 DAYS AFTER UNTIL SUCH TIME
> THAT NO THREAT EXISTS.

Id. (citing N.Y. COMP. CODES R. & REGS. TIT. 9, § 7013) (emphasis in original).  While not specifically articulated in the policy, defendant Franko affirmed, and the jail intake forms corroborated, that the same categories were used when classifying inmates as those articulated in the New York regulations.  Most specific to this case was Mendez's past criminal history and sex offender status.

It is undisputed that initially, during classification, Mendez spent four days segregated for classification purposes.  This time, in and of itself, is insufficient to establish a protected liberty interest.

Moreover, "[t]he [Supreme] Court has counseled judicial restraint in the federal courts' review of prison policy and administration, noting that courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform."  Giano v. Senkowski, 54 F.3d 1050, 1053 (2d Cir. 1995) (internal quotation marks and citations omitted).  The balancing test articulated in Turner v. Safely has been deemed uniquely instructive in considering whether "a prison regulation infringing on an inmate's constitutional rights is valid[,] so long as the regulation is reasonably related to the legitimate penological interests."  Harvey, 2012 WL 4093791, at *7 (citing Turner, 482 U.S. at 89).

> The Turner Court determined that the four factors to be considered
> are: 1) whether there is a rational relationship between the

25

> regulation and the legitimate government interests asserted; 2)
> whether the inmates have alternative means to exercise the right;
> 3) the impact that accommodation of the right will have on the
> prison system; and 4) whether ready alternatives exist which
> accommodate the right and satisfy the governmental interest.

Benjamin, 905 F.2d at 574 (citing Turner v. Safely, 483 U.S. 78, 89-91 (1987).

A recent case in the Northern District of New York has already deemed the initial, temporary segregation of an inmate in a county jail during classification procedures valid and not an infringement upon due process protections. Harvey, 2012 WL 4093791, at *7. In that case, the county jail had identical initial classification policies also based on the New York regulations.

> Until an inmate is screened for prior violence; propensity for
> victimization; possible enemies; behavior; and adjustment, the
> facility administrators have no way of knowing where the best place
> to house the inmate will be. Thus, a short classification period in
> administrative segregation in order to complete this objective is a
> completely reasonable restriction on an inmate's liberty.

Harvey, 2012 WL 4093791, at *7. For substantially similar reasons, to the extent that Mendez challenges his initial classification period spent in segregation, such contentions are insufficient to establish a due process violation.

### ii. Continued Placement in IPC

As previously explained, duration of confinement alone is not a dispositive factor in determining whether due process rights were infringed. Defendants continually contend that Mendez's confinement was administrative and prophylactic, not disciplinary. See e.g. Colon v. Goord, No. 05-CV-129 (TJM/GJD), 2008 WL 783364, at *7 (N.D.N.Y. Mar. 20, 2008) (explaining that in the NYS Department of Corrections and Community Supervision

("DOCCS") facilities, which fall under different regulations but have analogous housing classifications, "IPC is **not** a disciplinary unit . . . .") (emphasis in original). However, the undisputed housing conditions for Mendez in IPC, particularly being locked in one's cell for twenty-three hours a day, were more analogous to disciplinary confinement than segregation. See e.g. Id. (explaining that in the DOCCS facilities "IPC inmates are afforded more privileges and have less restrictions than Ad[ministrative] Seg[regation] inmates . . . [who] are subject to the same restrictions as disciplinary S[pecial ]H[ousing ]U[nit] inmates . . . .")This was acknowledged by the State Commission of Corrections in the letter which it sent to defendant Franko indicating that IPC inmates should not be locked in their cells all day and that, instead, their privileges should be more akin to general population inmates. See also Id. ("A review of [DOCCS] rules shows that many of the privileges accorded to general population inmates are also accorded to IPC inmates, albeit in a separate part of the facility."). Further, the letter stated that additional lock-down is acceptable when there are "bona fide safety and security reasons (administrative segregation order with written documentation)," none of which were included in the present record or argued to have existed by defendants. Accordingly, although not as long as the intermediate standard articulated above, the fact that Mendez spent an additional two months in IPC, in the aforementioned environment, is sufficient to satisfy the Sandin atypical environment test so that a liberty interest, protected by due process, has been established.

As a form of administrative segregation, as opposed to disciplinary confinement, placement in IPC "requires only an informal, nonadversary review." Smart v. Goord, 441 F. Supp. 2d 631, 641 (S.D.N.Y. 2006). The procedural due process protections are minimal, dictating that the informal review must occur within a reasonable time, after the inmate has

had some notice of the charges lodged against him and an opportunity to present his views

to the administrator making the determination about segregation. See e.g. McClary v. Kelly,

4 F. Supp. 2d 195, 212 (W.D.N.Y. 1998) (citing Hewitt . Helms, 459 U.S. 460, 460, 476

(1983)). Moreover, the "prison officials must engage in periodic review of the decision . . .

to ascertain whether a prisoner remains a security risk . . . [which is] supported by some

evidence." Id. at 212-13 (internal quotation marks and citations omitted). Lastly,

"administrative segregation may not be used as a pretext for indefinite confinement[, so] . . .

periodic reviews [cannot be] a sham; the reviews must be meaningful and not simply

perfunctory." Id. at 213 (citations omitted); see also Covino v. Vermont Dep't of Corr., 933

F.2d 128, 130 (2d Cir. 1991) (explaining that "[a]t some point, however, the administrative

necessity for involuntary lock-up begins to pale . . . [and] smacks of punishment.").

    Initially, Mendez received a document that indicated that because of his criminal history,

he was to be placed in IPC. Mendez signed the form, which served as notification of the

administrative segregation, as well as the initial opportunity for Mendez to express his

displeasure with his classification. Both appear to comply with the minimal procedures

guaranteed by the Due Process clause.

    The Montgomery policy indicated above details that the prison officials were supposed

to review the IPC inmates' files after sixty days and then, if the danger were deemed to still

persist, every thirty days thereafter. Moreover, inmates were allowed, after the initial sixty

day period, to seek review of their classification in IPC. Despite defendants'

representations to the contrary, it is clear that Mendez filed multiple grievances and written

requests to Franko as well as communicating with the COC. While the form of these

requests may not have been fully in compliance with the procedures preferred by

Montgomery, it is undeniably apparent that Franko was aware of Mendez's requests to return to general population.

Liberally construing the facts in the light most favorable to Mendez, regardless of whether he properly sought reclassification, it appears that he successfully appealed his classification. The records submitted indicated that approximately sixty days later Mendez underwent additional classification and defendants decided to maintain his IPC status. While this represents sufficient process, it is unclear whether this continued confinement was pretext for perpetual punishment. Accordingly, Mendez's "allegations raise the possibility that []he was confined in IPC without meaningful review . . .," and defendants have not provided sufficient factual support to quell such disputes in material facts. Smart, 441 F. Supp. 2d at 642.

Additionally, to the extent that defendants may rely on the Turner analysis above to relieve them of responsibility in the face of a potential constitutional infringement, such reliance is misplaced. Defendants have failed to proffer sufficient evidence to establish the absence of a question of material facts. Defendants repeatedly state that housing inmates with a criminal history of sex crimes or with a sex offender status was not punitive, but rather prophylactic, as these inmates represented a risk to safety and security of the facility. Defendants have proffered an affidavit from Franko which indicates that inmates with sex offender status were generally more vulnerable and susceptible to victimization, the population of the jail was increasing without a concomitant increase in the number of corrections officers, and that increase was attributed primarily to larger numbers of sex offenders entering custody. Other districts have deemed an inmate's sex offender status to represent a safety issue requiring protective custody. See e.g. Tucker v. Royce, Nos.

29

09CV35-MPM-JAD, 09CV106-MPM-JAD, 10CV4-MPM-JAD, 2011 WL 541116, at *6 (N.D.Miss. Feb. 8, 2011) (denying Eighth Amendment claims regarding IPC classification because the inmate "was placed in [IPC] for a reason: as a sex offender, he was vulnerable to assault from other inmates . . . ."). Moreover, the Second Circuit has discussed, though not explicitly commented on the constitutionality of the policy of offering IPC to inmates with sex offender histories. See Arnold v. County of Nassau, 252 F.3d 599, 601 (2d Cir. 2001) (explaining in an action alleging failure to protect, and not a due process violation, that the inmate was initially placed into IPC "pursuant to 'Warden's Order: Sex Crimes,' an order designed to assure that inmates charged with sex crimes are removed from the general prison population because they are a greater risk of assault by other inmates.").

However, the present record proffers nothing more than conclusory assertions about the circumstances faced by defendants at Montgomery. Defendants have failed to provide any documentation regarding information including specific numbers of the inmate population and the percentage of sex offenders previously housed at Montgomery, that population's anticipated increase in comparison to the rest of the incoming inmate population, or the number of attacks on sex offenders or those with a sexually based criminal history. See Smart, 441 F. Supp. 2d at 645 (denying qualified immunity because defendants failed to demonstrate anything more than "conclusory statements" about safety concerns essentially providing the court with "no showing that there was any reason to fear for [the inmate's] personal safety.").

Accordingly, to the extent that procedural due process claims are intimated regarding Mendez's continued confinement in IPC, material questions of fact exist so that such claims should remain as litigation moves forward.

30

**b. Substantive Due Process**

Liberally reading Mendez's complaint, it appears he has also alleged a substantive due process claim concerning his placement and continued confinement in IPC based on his criminal history. "Substantive due process protects individuals against government action that is arbitrary, conscience-shocking, or oppressive in a constitutional sense . . . but not against government action that is 'incorrect or ill-advised'" Lowrance v. Achtyl, 20 F.3d 529, 537 (2d Cir.1994) (internal citations omitted). "To establish a violation of substantive due process rights, a plaintiff must demonstrate that the state action was 'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.'" Okin v. Villiage of Cornwall-On-Hudson Police Dep't, 577 F.3d 415, 431 (2d Cir. 2009) (quoting County of Sacramento v. Lewis, 523 U.S. 833, 847 n.8 (1998)). As already observed by the Northern District of New York, "[v]ery few conditions of prison life are 'shocking' enough to violate a prisoner's right to substantive due process. In Sandin v. Conner, the Supreme Court provided only two examples: the transfer to a mental hospital and the involuntary administration of psychotropic drugs." Samms v. Fischer, No. 10-CV-349 (GTS/GHL), 2011 WL 3876528, at *12 (N.D.N.Y. Mar. 25, 2011) (citations omitted).

In this case, while the actions of defendants in articulating a policy which summarily housed a population of inmates in IPC pursuant to potentially legitimate concerns related to inmate facility and security could be categorized as incorrect or ill-advised, it does not appear that such a policy was arbitrary, conscience shocking, or constitutionally oppressive. Moreover, given the limited number of recognized circumstances where substantive due process is advanced, and the dissimilarity between those instances and the present claim, to the extent that Mendez is attempting to advance such due process arguments, they are

31

insufficient to establish a constitutional claim.

## 2. Equal Protection

The Fourteenth Amendment's Equal Protection Clause mandates equal treatment under the law.  Essential to that protection is the guarantee that similarly situated persons be treated equally.  City of Cleburne, Tex. v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985); Phillips v. Girdich, 408 F.3d 124, 129 (2d Cir. 2005) ("To prove a violation of the Equal Protection Clause . . . a plaintiff must demonstrate that he was treated differently than others similarly situated as a result of intentional or purposeful discrimination.").  "[A]bsent classification by race, alienage or national origin, legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest."  Vargas v. Pataki, 899 F. Supp. 96, 98 (N.D.N.Y. 1995) (citations, quotation marks, and internal alterations omitted).  Accordingly, strict scrutiny shall only be employed "where the classification involves a fundamental right or a suspect class."  Id. (citations and quotation marks omitted).

If an inmate is unable to establish membership in a protected class, "the Supreme Court has recognized 'class of one' claims, where the plaintiff must prove that he was intentionally treated differently from others similarly situated without a rational basis for the difference in treatment."  Fortunatus v. Clinton County, N.Y., No. 12-CV-458 (RFT), 2013 WL 1386641, at *11 (N.D.N.Y. Apr. 4, 2013) (citing Vill. of Willowbrook v. Olech, 528 U.S. 562, 564 (2000)).  Such plaintiffs

> must show an extremely high degree of similarity between themselves and the persons to whom they compare themselves . . . [and] must establish that (1) no rational person could regard the

> circumstances of the plaintiff to differ from those of a comparator to
> a degree that would justify the differential treatment on the basis of
> a legitimate government policy; and (ii) the similarity in
> circumstances and difference in treatment are sufficient to exclude
> the possibility that the defendants acted on the basis of a mistake.

Clubside, Inc. v. Valentin, 468 F.3d 144, 159 (2d Cir. 2006) (citations omitted). "Generally, whether parties are similarly situated is a fact-intensive inquiry," best suited for the jury, unless "no reasonable juror could find that the persons to whom plaintiff compares itself are similarly situated," and then summary judgment is appropriate. Id. (citations omitted).

Prisoners are not a part of a suspect class. Scott v. Denison, 739 F. Supp. 2d 342, 362 (W.D.N.Y. 2010) (citations omitted); Lee v. Governor of State of New York, 87 F.3d 55, 60 (2d Cir. 1996) ("[P]risoners either in the aggregate or specified by offense are not a suspect class . . . ."). "[S]ex offenders [also] do not compromise a suspect or quasi-suspect class . . . . [thus any] allegedly different treatment is subject to rational basis scrutiny, that is, it must be rationally related to a legitimate state interest." Taylor v. New York State Dep't of Corr. Servs., No. 07-CV-1288 (NAM/RFT), 2009 WL 3522781, at *2 (N.D.N.Y. Oct. 29, 2009) (citations omitted).

In this case, a question of fact remains as to Mendez's Equal Protection claim. Both sides agree that Montgomery's policy was to summarily classify and house all sex offenders in IPC for their own safety. Therefore, sex offenders were treated differently from all other inmates who were generally housed in, and accorded the amenities of, general population. Mendez has successfully established a high degree of similarity between himself and the other sex offenders and such similarity and difference in treatment are undisputable so that mistake is not a reasonable possibility.

As previously discussed, defendants have proffered affidavits indicating that their policy

of confining sex offenders and those with sexual offenses in their criminal history to IPC

was based on a legitimate concern for safety in the prison given the increasing number of

inmates and stagnant number of staff. Furthermore, for the reasons articulated above,

there are questions of fact which surround the legitimacy of Montgomery's policy given the

lack of factual and statistical evidence. Conversely, if defendants' claims are proven to be

more than conclusory, a rational basis may be deemed to exist. Accordingly, defendants'

have failed to provide sufficient evidence to establish that no question of material fact exists

regarding the reasons defendants are proffering for segregating sex offenders to IPC.

Accordingly, defendants' motion on this ground is denied.


### D. Qualified Immunity

Defendants also contend that they are entitled to qualified immunity. Qualified immunity

generally protects governmental officials from civil liability "insofar as their conduct does not

violate clearly established statutory or constitutional rights of which a reasonable person

would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); Aiken v. Nixon, 236 F.

Supp. 2d 211, 229-30 (N.D.N.Y. 2002) (McAvoy, J.), aff'd, 80 Fed.Appx. 146 (2d Cir. Nov.

10, 2003).

> [A] decision dismissing a claim based on qualified immunity at the
> summary judgment state may only be granted when a court finds
> that an official has met his or her burden demonstrating that no
> rational jury could conclude (1) that the official violated a statute or
> constitutional right, and (2) that the right was clearly established at
> the time of the challenged conduct.

Coollick v. Hughes, 699 F.2d 211, 219 (2d Cir. 2012) (quoting Ashcroft v. al-Kidd, 131 S.Ct.

2074, 2080 (2011)) (internal quotation marks omitted). The Supreme Court has granted

district courts "discretion to decide which of the two prongs . . . to tackle first [in order to] . . . save[] judicial resources by avoiding unnecessary decisions whether certain conduct violates a constitutional or statutory right, which it is beyond reproach that the conduct was not objectively unreasonable in light of existing law." Id. (internal quotation marks and citations omitted).

A constitutional right is clearly established if it is both reasonably specified and affirmed by both Supreme Court and Second Circuit case law and understood to be viewed by a reasonable defendant as unlawful under the status of the law at the relevant time in question. Looney v. Black, 702 F.3d 701, 706 (2d Cir. 2012). Such an inquiry is context-specific, looking at "the contours of the right" which is alleged to be protected so that "the very action in question [need not] ha[ve] previously been held unlawful; but . . . in the light of pre-existing law the unlawfulness must be apparent." Doninger v. Niehoff, 642 F.3d 334, 345-46 (2d Cir. 2011) (internal quotation marks and citations omitted).

Defendants contend that their decision to institute a policy segregating all inmates labeled as sex offenders or with sexually violent crimes in their criminal histories into IPC is protected by the qualified immunity doctrine. While there is no New York regulation concerning the placement or review of an inmate in local custody being placed into IPC, or a case which has been decided presenting identical facts, the constitutional rights surrounding an individual's right to due process and to remain housed in a manner presenting neither atypical nor significantly different circumstances than ordinary prison life were clearly established at the time of the case. See Sandin v. Conner, 515 U.S. 472 (1995); Wright v. Coughlin, 132 F.3d 133, 136-38 (2d Cir. 1998) (discussing how duration and conditions of confinement serve to illustrate the atypical and significant requirement

created by <u>Sandin</u>).  Moreover, the right of an inmate in administrative segregation to receive informal, periodic reviews was also clearly established.  <u>See</u> <u>Hewitt</u>, 459 U.S. at 476, 477 n.9 (deeming informal, non-adversarial procedures sufficient for administrative segregation and requiring periodic and meaningful reviews of continued confinement to preclude such confinement as a pretext for indefinite punishment).  As was an inmate's right not to be treated different than others unless a rational basis existed. <u>See</u> <u>Lee v. Governor of State of New York</u>, 87 F.3d 55, 60 (2d Cir. 1996) (citing <u>City of Cleburne v. Cleburne Living Ctr., Inc.</u>, 473 U.S. 432, 440 (1985)).  Accordingly, it is apparent that Mendez's Fourteenth Amendment rights to Due Process and Equal Protection were clearly established at the time in question.

Defendants contend that because of increased inmate populations, legitimate concerns for the safety and security of the institution, inmates, and staff compelled IPC for inmates like Mendez.  Similar scenarios make it clear that a holding an inmate in segregation, under adverse conditions, without a legitimate basis, and without review is unreasonable. <u>See Smart v. Goord</u>, 441 F. Supp. 2d 631, 645 (S.D.N.Y. 2006) (denying qualified immunity where defendants "made no showing with regard to either the conditions of . . . confinement or the extent to which confinements of similar duration may or may not be typical . . . .," proffered only conclusory allegations about asserted safety concerns, and failed to defeat arguments that procedural protections afforded to inmate were anything more than "hollow formalit[ies].").  Despite defendants' proffers to the contrary, at this juncture, for the reasons stated above, the undersigned cannot conclude that defendants' have met their burden in demonstrating that the policy was rationally related to a legitimate penological objective. Without proof of a compelling safety concern, neither defendants' actions can be deemed

36

reasonable given the case law and constellation of circumstances surrounding Mendez's IPC confinement.

Accordingly, it is recommended that defendants' motion on this ground be denied.

### E. PLRA

Defendants correctly state that the PLRA provides that "[n]o Federal civil action may be brought by a prisoner confined in jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." 42 U.S.C. § 1997e(e).  To the extent Mendez seeks recovery for compensatory damages related to emotional injury, such recovery would be precluded without showing a concomitant physical injury. Jenkins v. Haubert, 179 F.3d 19, 28-29 (2d Cir. 1999) ("[I]n the case of suits seeking damages for mental or emotional injuries . . . a defendant in a prisoner § 1983 suit may also assert as an affirmative defense the plaintiff's failure to comply with the PLRA's requirements [and make a prior showing of a physical injury]."). However, this clause is merely a limitation on the recovery of damages and "does not restrict a plaintiff's ability to recover compensatory damages for actual injury, nominal or punitive damages, or injunctive and declaratory relief." Thompson v Carter, 284 F.3d 411, 416 (2d Cir. 2002).

The Second Circuit has determined that intangibles can serve as a basis for recovery. Specifically, "[t]he damages recoverable for loss of liberty for the period spent in a wrongful confinement are separable from damages recoverable from such injuries as physical harm, embarrassment, or emotional suffering; even absent such other injuries, an award of [money] . . . may be appropriate . . . for . . . loss of liberty." Kerman v. City of New York,

374 F.3d 93, 125-26 (2d Cir. 2004) (citations omitted).  The claims surviving defendants'

motion involve the loss of such intangibles as liberty through a lack of due process and

equal protection.  Such claims represent those which fall outside of the physical harm

requirement of the PLRA.  Accordingly, for these reasons, defendants' motion is denied on

this ground.


## IV.  Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that defendants' motion for

summary judgment (Dkt. No. 23) be:

1. **GRANTED** with respect to Mendez's claims regarding his condition of confinement,

   access to the law library and counsel, and freedom to practice his religion; and

2. **DENIED** in all other respects[7].

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the

foregoing report.  Such objections shall be filed with the Clerk of the Court "within fourteen

(14) days after being served with a copy of the . . . recommendation."  N.Y.N.D.L.R. 72.1(c)

(citing 28 U.S.C. §636(b)(1)(B)-(C)).  **FAILURE TO OBJECT TO THIS REPORT WITHIN**

**FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.**  Roldan v. Racette, 984

F.2d 85, 89 (2d Cir. 1993); Small v. Sec'y of HHS, 892 F.2d 15 (2d Cir. 1989); 28 U.S.C. §

---

[7] Defendants move for summary judgment contending that Mendez's Equal
Protection, conditions of confinement, access to counsel and law library, and freedom to
practice his religion claims be dismissed.  For the reasons discussed supra, defendants'
motion is to be granted with respect to all but the Equal Protection claims.  Defendants fail
to discuss the merit of Mendez's inartfully pled due process claims which, for the reasons
stated supra, should not be dismissed.

636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).


Dated:  June 18, 2013
        Albany, New York

Christian F. Hummel
U.S. Magistrate Judge